UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN TEXAS
AUSTIN DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>                    PLAINTIFF,<br><br>v.<br><br>CHARLES H. MCALLISTER<br><br>                    DEFENDANT. | CIVIL ACTION NO. 1:18-CV- 0346 |

**COMPLAINT FOR INJUNCTIVE RELIEF,
CIVIL MONETARY PENALTIES, AND OTHER RELIEF**

Plaintiff Commodity Futures Trading Commission ("CFTC") alleges as follows:

### I.    SUMMARY

1. In 2009, Charles H. McAllister ("McAllister"), through his company, BullionDirect, Inc. ("BDI"), began operating a fraudulent scheme involving precious metals that resulted in customer losses of more than $16 million. During the scheme, McAllister and BDI offered contracts of sale in gold, silver, platinum, and palladium, all commodities in interstate commerce. From August 15, 2011, through July 20, 2015 (the "Relevant Period"), McAllister and BDI defrauded thousands of customers throughout the United States who purchased precious metals from or through BDI.

2. Despite the offers of sale, McAllister and BDI failed to purchase the precious metals that BDI was obligated to procure for customers. While BDI did purchase some of the precious metals it was obligated to procure for customers, it failed to purchase *all* the precious metals it was obligated to procure for customers. Instead, McAllister and BDI misappropriated

some customer funds obligated for precious metals purchases. Additionally, as part of the fraudulent scheme, McAllister and BDI made material misrepresentations and omissions and issued false account statements to customers.

3. BDI filed for bankruptcy on July 20, 2015, owing thousands of BDI customers millions of dollars in precious metals and cash.

4. Through his conduct, McAllister was engaged, is engaging, or is about to engage in fraudulent acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-27f (2012), and the CFTC's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pt. 1-190 (2017), specifically Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2017).

5. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the CFTC brings this action to enjoin such acts and practices and compel compliance with the Act. In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

6. Unless restrained and enjoined by this Court, McAllister is likely to continue engaging in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.    JURISDICTION AND VENUE

7. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012), which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress. Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a)

(2012), authorizes the CFTC to seek injunctive relief in any proper district court of the United States against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

8. Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because the acts and practices in violation of the Act occurred, are occurring, or are about to occur, within the Western District of Texas.

### III.    THE PARTIES

9. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations.

10. Defendant **Charles H. McAllister** ("McAllister") is a resident of Auburn, Alabama.  McAllister was a co-founder and the president, majority shareholder, and chief executive officer of BDI during the Relevant Period.  McAllister has never been registered with the CFTC.

### IV.    FACTS

11. McAllister and BDI, through BDI's precious metals business, operated a fraudulent scheme in which they misappropriated customer funds, made material misrepresentations and omissions, and issued false account statements.  This fraud resulted in customer losses of $16,186,212.56.

**A.     BDI Operated a Web-Based Precious Metals Business.**

12.     McAllister founded BDI in 1999.  During the Relevant Period, BDI—by and through McAllister, among others—operated a web-based precious metals company that sold precious metals to customers through an online catalog and a precious metals exchange.  BDI was based in Austin, Texas.

13.     During the Relevant Period, McAllister and BDI maintained a website through which customers throughout the United States were solicited to purchase gold, silver, platinum, and palladium from or through BDI.  The website stated that BDI provided a platform for the "trading, clearing, purchasing, and validation of physical precious metals."

14.     BDI customers could purchase precious metals directly from BDI through its online catalog.  Customers had the option of having their precious metals delivered immediately or storing the precious metals at BDI.

15.     BDI customers could also purchase precious metals from other sellers through BDI's exchange, called Nucleo, which was an order matching platform that allowed buyers and sellers to trade precious metals with each other.  After customers traded precious metals through Nucleo, BDI processed the trades by confirming the trades, receiving and validating precious metals from the seller, receiving cash from the buyer, and distributing the precious metals to the buyer and cash to the seller.  Similar to customers who purchased precious metals from BDI through its online catalog, customers who purchased precious metals through Nucleo could take immediate delivery of the precious metals or store them at BDI.

16.     Prior to 2012, BDI was contractually obligated to purchase precious metals for customers—whether they opted to have it immediately delivered or to store it with BDI— immediately upon receiving payment from customers.  In 2012, BDI changed its operations and

was contractually obligated to purchase precious metals for customers within twenty-eight days of receiving payment from customers.

17. BDI allowed customers to deposit and maintain cash in their accounts at BDI to make future purchases of precious metals.

18. McAllister and BDI used the mails or other instrumentalities of interstate commerce to (1) receive checks, wires, and credit card payments from BDI customers; (2) make representations to BDI customers; and (3) disseminate account statements to BDI Customers.

19. Gold, silver, platinum, and palladium are commodities pursuant to Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012), because they are goods in which contracts for future delivery are presently or in the future dealt in.

B. **BDI's Operations Were Fraudulent.**

　　1. **McAllister and BDI Misappropriated BDI Customer Funds.**

20. During the Relevant Period, McAllister and BDI misappropriated millions of dollars from thousands of customers in connection with their fraudulent scheme.

21. From its inception, BDI lacked an adequate accounting function. Among other things, BDI commingled customer and BDI funds in one operating account, did not have an operating budget, and did not know its profitability. Until 2010, it did not prepare financial statements, track how much precious metals it owed customers storing precious metals at BDI, or file tax returns.

22. In 2010, in preparation for filing tax returns and implementing new accounting software, BDI prepared financial statements for the first time in its history. BDI's controller and a BDI business consultant presented McAllister with the financial statements, which revealed that BDI was insolvent. Specifically, BDI owed customers approximately $32 million of

precious metals, yet BDI only had $8 million of precious metals in storage. These financial statements showed that BDI lacked sufficient cash and other assets to cover the value of the precious metals it owed customers and that BDI was not making enough money from precious metals transactions to cover its operating expenses.

23. The financial statements revealed that McAllister and BDI had been using customer funds obligated for precious metals purchases to, among other things, pay back other customers, cover BDI business expenses, and invest in other businesses.

24. McAllister knew that the only way to keep BDI afloat was to continue misappropriating customer funds. And so he and BDI did just that. McAllister decided to continue operating BDI, and he and BDI knowingly misappropriated customer funds in doing so.

25. In September or October 2012, BDI's controller and a BDI business consultant again approached and confronted McAllister about BDI's continued fraudulent operations. They urged McAllister to disclose to BDI customers that BDI was unable to meet its outstanding precious metals obligations to all of its customers and to change BDI's operations going forward to limit further customer harm. They expressed a concern about criminal exposure if BDI did not make the disclosures and adjustments to its operations. McAllister refused to do either, and both the controller and business consultant immediately resigned.

26. In October 2012, McAllister and BDI announced on BDI's website that "BDI has made a strategic decision to . . . discontinue accepting further deposits of metals for storage in our vault, including new deposits by existing customers." Per BDI's website, customers who purchased precious metals from or through BDI would "be required to request physical delivery within 21 days." Despite this announcement, BDI did not change anything about its operations

and continued to store precious metals for its customers throughout the Relevant Period, whether or not customers requested delivery within 21 days.

27. Throughout the Relevant Period, BDI, at McAllister's direction, used customer funds that were obligated for precious metals purchases to pay BDI's operating expenses, pay back other customers in the nature of a Ponzi scheme, and invest in other businesses.

### 2. McAllister and BDI Made Material Misrepresentations and Omissions to Customers.

28. During the Relevant Period, McAllister and BDI made material misrepresentations and omissions to customers in the course of their fraudulent precious metals scheme.

29. BDI, at McAllister's direction, published on the BDI website the **"BullionDirect Terms of Service"** ("Terms of Service"), which BDI required customers to read and accept.

30. The Terms of Service purportedly applied to all transactions between BDI and BDI customers.

31. The Terms of Service stated:

> Delivery to Customer or on Customer's Behalf. Upon receipt of good funds or other acceptable consideration from Customer or on Customer's behalf in full payment for the purchase of Products, BullionDirect® shall, as agreed, deliver the Products: (i) to Customer, or (ii) to Customer's appointed agent or designee. Upon receipt of good funds or other acceptable consideration from Customer, BullionDirect® shall make delivery within twenty-eight (28) days, or such lesser period as required by law, all of the Products purchased. . . .
>
> When Title to Products Passes to Customer. Title to the Products purchased by Customer shall pass to Customer upon delivery to Customer or Customer's appointed agent or designee. Products that have been delivered to BullionDirect®'s storage facility for Customer will be held in safekeeping on a fungible basis and Customer will receive title to an undivided share of the Products so held. Notwithstanding the passage of title to Customer,

> BullionDirect® may use such Products, in fungible form, held for Customer. Customer understands that such usage of the Products in this form may result in gains or losses, which will inure solely to the benefit of BullionDirect®.

32. The exact wording of the Terms of Service published on the BDI website may have been different at various times during the Relevant Period. But, upon information and belief, all Terms of Service in effect during the Relevant Period indicated that (1) BDI would deliver precious metals to customers within twenty-eight days of the customer's purchase; and (2) BDI had use of customers' precious metals while it was in storage, but BDI would bear all risk of loss associated with its use of the precious metals.

33. McAllister's and BDI's representation in the Terms of Service that BDI would deliver precious metals to customers within twenty-eight days of the customer purchasing precious metals from BDI was false. McAllister was solely in charge of purchasing precious metals for BDI. He did not procure all the precious metals BDI was obligated to purchase for customers; consequently, BDI did not deliver to customers within twenty-eight days, or ever, all the precious metals it was obligated to purchase for customers. Customers would not have purchased precious metals from BDI if they had known that BDI was not procuring the full amount of precious metals it was obligated to purchase for customers.

34. McAllister and BDI knew the representation that BDI would deliver precious metals to customers within twenty-eight days of the customer purchasing precious metals from BDI was false.

35. McAllister's and BDI's representation in the Terms of Service that BDI would bear any loss associated with BDI's use of customers' precious metals while it was stored at BDI was false. BDI was insolvent during the Relevant Period. It lacked sufficient assets to purchase all the precious metals it owed to customers and therefore had no ability to replenish any loss

that resulted from BDI using customers' precious metals in its storage facility. Customers who stored precious metals at BDI—both customers who purchased precious metals from BDI and customers who purchased precious metals through Nucleo—would have never done business with BDI or stored their precious metals at BDI if they had known that BDI would use their precious metals but be unable to replace it in the event of loss.

36.     McAllister and BDI knew that the statement about BDI bearing the risk of loss associated with BDI's use of customers' precious metals stored with BDI was false or they acted with reckless disregard for the truth. McAllister and BDI knew BDI was insolvent. Moreover, they had no reasonable plan for resolving BDI's insolvency or buying all the precious metals BDI owed to its customers.

37.     McAllister and BDI failed to tell customers that BDI had not purchased precious metals for numerous customers and, as a result, owed customers millions of dollars in precious metals that BDI did not possess and lacked sufficient assets to procure. Customers would not have purchased precious metals from or through BDI if they had known that BDI was operating with insufficient assets and owed customers millions of dollars in precious metals.

38.     During the Relevant Period, McAllister and BDI failed to tell customers that they were not procuring all the precious metals they were obligated to purchase for customers. Customers would not have purchased precious metals from or through BDI if they knew that BDI may not have used their funds to purchase precious metals.

### 3. McAllister and BDI Generated False Account Statements.

39.     Throughout the Relevant Period, BDI customers had access to online account statements generated by BDI, at McAllister's direction. BDI customers accessed their account statements in the portfolio section of their online accounts on BDI's website.

40. These account statements purported to provide, among other things, (1) customer account balances of precious metals (listed by SKU number and denominated in ounces) and cash; and (2) the BDI storage facility in which customer precious metals were held.

41. Many of these account statements were false because BDI had not purchased all the precious metals it was obligated to purchase for customers (as listed by SKU number on the account statements) and did not have precious metals or sufficient assets to cover the precious metals or cash balances represented in the account statements.

42. McAllister and BDI knew the account statements were false.

**C.     McAllister Was the Mastermind of BDI's Fraud.**

43. During the Relevant Period, McAllister was the only executive at BDI. In addition to CEO, he functionally served as the chief operating officer and chief financial officer.

44. During the Relevant Period, McAllister made all financial and strategic decisions for BDI.

45. During the Relevant Period, McAllister directed, among other things, how much precious metals BDI purchased from precious metals wholesalers, how to pay for BDI's operating expenses, that customer funds be invested in other businesses, the drafting of BDI's Terms of Service, and the information to be published on BDI's website.

46. McAllister knowingly induced BDI's fraudulent acts by virtue of directing those fraudulent acts.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT

**FRAUDULENT AND DECEPTIVE DEVICES**
Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and
Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3)

47. Paragraphs 1 through 46 are re-alleged and incorporated herein by reference.

48. Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), renders it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act [July 21, 2010] . . . .

49. Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2017), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

50. McAllister and BDI employed or attempted to employ a scheme or artifice to defraud.

51. As described above, during the Relevant Period and in connection with contracts of sale of commodities in interstate commerce, McAllister and BDI through their

agents and employees, directly and indirectly, violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3) by, among other things, (1) misappropriating BDI customer funds; (2) making material misrepresentations that BDI was procuring all the precious metals it was obligated to purchase for customers within twenty-eight days; (3) making material misrepresentations that BDI would bear the loss of any customers' precious metals they used while in storage at BDI; (4) omitting to tell customers that they had failed to procure precious metals for numerous customers and owed customers millions of dollars in precious metals that they did not possess and lacked sufficient assets to procure; (5) omitting to tell customers that they were not procuring all the precious metals they were obligated to purchase for customers; and (6) issuing false account statements to customers.

52.     McAllister and BDI engaged in the acts and practices described above intentionally or recklessly.

53.     The acts, practices, and the course of business of McAllister and BDI also operated as a fraud upon BDI's customers.

54.     At all times relevant to this Complaint, McAllister controlled BDI, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, BDI's conduct alleged in this Count; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), McAllister is liable for BDI's violations of Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3).

55.     Each act of misappropriation or misrepresentation or omission of material fact or issuance of a false account statement including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3).

## VI.  RELIEF REQUESTED

The CFTC respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A. Enter an order finding that McAllister and BDI violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2102), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2017);

B. Enter an order of permanent injunction enjoining McAllister, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them who receive actual notice of such order by personal service or otherwise, from violating Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3);

C. Enter an order of permanent injunction prohibiting McAllister from, directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 83 Fed. Reg. 7979 (Feb. 23, 2018) (to be codified at 17 C.F.R. pt. 1), for accounts held in McAllister's name or for accounts in which McAllister has a direct or indirect interest;

3) Having any commodity interests traded on his behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and

13

   7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9);

 D. Enter an order requiring McAllister to disgorge to any officer appointed by the Court all benefits received from acts or practices that constitute violations of the Act and Regulations as described herein, including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

 E. Enter an order requiring McAllister to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by McAllister's and BDI's violations (in the amount of such losses), as described herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

 F. Enter an order directing McAllister to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between BDI and any of the customers whose funds were received by BDI as a result of the acts and practices which constituted violations of the Act and Regulations, as described herein;

 G. Enter an order requiring McAllister to pay a civil monetary penalty under the Act, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, see Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation of the Act, as described herein;

H. Enter an order requiring McAllister to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2012); and

I. Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: April 26, 2018                    Respectfully submitted,

By:   s/ Jo Mettenburg
Jo Mettenburg (Kansas Bar # 19423)
J. Alison Auxter (Missouri Bar # 59079)
Attorneys for Plaintiff
Commodity Futures Trading Commission
4900 Main Street, Suite 500
Kansas City, MO 64112
(816) 960-7700 (telephone)
(816) 960-7751 (facsimile)